**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| MCLEODUSA TELECOMMUNICATIONS SERVICES, INC., | ) ) ) | Misc. Action No. 1:08-mc-0011-EGS |
|  | ) |  |
| Plaintiff, | ) ) | <u>Related to:</u> <br> **Civil Action No.  1:06-cv-00035-MWB** |
| QWEST CORPORATION and QWEST COMMUNICATIONS CORPORATION, | ) ) ) ) | **United States District Court** **For the Northern District of Iowa** **(Cedar Rapids Division)** |
|  | ) |  |
| Defendants. | ) ) |  |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO MCLEOD'S MOTION TO COMPEL AND TO ENFORCE SUBPOENA**

This motion to compel is frivolous for two separate reasons.  First, it completely misunderstands the facts and law of the attorney-client privilege being asserted here.  Second, it completely ignores the work product doctrine that equally shields the sought-after information from discovery.

The subpoena at issue arises from litigation between two telephone carriers, McLeodUSA Telecommunications Services, Inc. ("McLeod") and Qwest Corporation and Qwest Communications Corporation (jointly "Qwest").  The lawsuit involves approximately one a dozen factually complex billing disputes involving the parties' charges for a variety of phone calls.  One of the two Qwest corporate defendants for years has outsourced to TEOCO Corporation ("TEOCO") the function of analyzing bills from other carriers such as McLeod to Qwest.  TEOCO employees work closely with their Qwest counterparts to analyze bills and recommend what bills to pay or not pay, and so forth.  When billing disputes arise and matters go into litigation between Qwest and other carriers, as happened here with McLeod, TEOCO employees assist Qwest in the litigation.

TEOCO employees therefore are "functionally" the equivalent of Qwest employees.  The law throughout the country, including in this Circuit, is that Qwest enjoys a privilege over all communications between Qwest's counsel and TEOCO employees in the course of counsel's litigation of the lawsuit against McLeod.  The attorney-client privilege applies to these communications because the communications are functionally no different than counsel's communications with Qwest's own employees in the litigation.  McLeod has deposed numerous Qwest witnesses in the case and never challenged Qwest's assertion of its privilege in those depositions; and the law is that the very same privilege that governs counsel's communications with TEOCO.

McLeod totally misunderstands the issue.  McLeod analyzes whether **_TEOCO_** has a privilege in the communications.  McLeod makes the point that Qwest's counsel did not "represent" TEOCO until recently, after most of the communications at issue, so there would be no TEOCO privilege in those communications.  But the objection to McLeod's discovery is not based on TEOCO's privilege; it is based on Qwest's privilege.  It is irrelevant that Qwest's counsel did not "represent" TEOCO at the time of the communications.  Corporate counsel does not "represent" a company employee either; the situation is no different with TEOCO employees.

But even if Qwest's attorney-client privilege did not shield counsel's communications with TEOCO employees, the work product doctrine surely does.  McLeod wants TEOCO witnesses to testify about Qwest's counsel's strategies in the case.  If that information is not protected by the work-product doctrine, then nothing is.  It is black-letter law that counsel's work product is shielded from discovery even if it is disclosed to third parties, so

long as the third parties are not adverse to Qwest.  Qwest's counsel raised this issue with

McLeod, but McLeod has chosen to ignore the work-product doctrine obstacle to its motion.

 For these reasons, the Court should deny McLeod's motion in all respects.

### THIS COURT LACKS PERSONAL JURISDICTION OVER TEOCO

 As an initial and independently dispositive matter, the Court should deny

McLeod's motion because it lacks personal jurisdiction over TEOCO.  TEOCO is headquartered

in Reston, Virginia.  Declaration of Michael McDonnell (General Counsel of TEOCO)

("McDonnell Decl."), ¶ 2, attached hereto as Exhibit 1.  TEOCO has no contacts with the District

of Columbia:  It has no offices, property or employees here; it does not have any vendors or

customers who are based in the District of Columbia; and it does not pay taxes to or have any

licenses or registrations with the District of Columbia.  *Id.*  One of the witnesses flew in from

Kansas City for the deposition; the other two are Virginia residents.  Furthermore, the

depositions at issue did not occur in the District of Columbia; they were taken at counsel's

offices in Reston, Virginia.  There is simply no basis for this Court to assert personal jurisdiction

over TEOCO or the witnesses.

### RELEVANT BACKGROUND

**I.** **TEOCO PROVIDES QWEST'S BILL AUDITING, ANALYSIS, AND PAYMENT PROCESSES**

 TEOCO is a services vendor providing bill-auditing services to Qwest.

Declaration of Derek Canfield ("Canfield Decl."), ¶¶ 1-2, attached hereto as Exhibit 2.  These

services include auditing services for invoices sent to Qwest by other telecommunications

carriers.  *Id.* at 2; McDonnell Decl., ¶ 3.  In that capacity, TEOCO processes and reviews these

invoices for potential billing errors.  Canfield Decl., ¶¶ 2, 6; McDonnell Decl., ¶ 4.  Since at least

early 2005, TEOCO has been responsible for processing and auditing McLeod's bills to Qwest.

McDonnell Decl., ¶ 5.  TEOCO then provides to Qwest an analysis of each monthly invoice,

including McLeod's charges, the breakout of those charges, and the amount of charges in

dispute.  Canfield Decl., ¶ 6.

Since July, 2006, TEOCO's bill analysis work for Qwest has been led by Derek

Canfield, a Senior Team Lead within TEOCO's audit services organization.  Canfield Decl.,

¶¶ 1, 7.  As the primary auditor of McLeod's invoices, Mr. Canfield is responsible for, or

supervises employees who are responsible for, processing and auditing the charges in McLeod's

invoices.  *Id.* at ¶¶ 5-6.  Mr. Canfield is also the first person to identify the amount of McLeod's

access charges Qwest is disputing each month.  *Id*.

## II.    TEOCO HAS ASSISTED QWEST'S COUNSEL IN THIS LITIGATION ABOUT MCLEOD'S BILLS

McLeod filed this lawsuit in March 2006 in U.S. District Court for the Northern

District of Iowa.  Declaration of David A. Vogel (Outside Counsel for Qwest) ("Vogel Decl."),

¶ 2, attached hereto as Exhibit 3.  The lawsuit involves McLeod's and Qwest's cross-claims

arising out of approximately one dozen billing disputes.  *Id.* at 3.  Two of McLeod's claims

(Counts II and VI of the Complaint) arise from McLeod's bills to Qwest that Qwest has not paid.

Qwest's lead outside counsel in the lawsuit are Messrs. Douglas Lobel and David

Vogel.  *Id.* at 2.  From the start of their factual investigation of the litigation and continuing

through to the present, counsel have communicated with TEOCO employees on numerous

occasions.  Canfield Decl., ¶ 7; McDonnell Decl., ¶¶ 5-6; Vogel Decl., at ¶¶ 4-5, 7.  Part of the

communications have involved counsel's factual investigation, such as TEOCO's role in Qwest's

discovery of problems with McLeod's invoices.  Canfield Decl., ¶¶ 5-7; Vogel Decl., ¶ 4.  At

times, counsel has relied on TEOCO's technical abilities to analyze electronic data produced by McLeod, such as individual records of millions of phone calls, or compilation and summaries of massive electronic invoices.  Canfield Decl., ¶ 7; McDonnell Decl., ¶ 5; Vogel Decl., ¶ 5. Counsel have primarily communicated with Mr. Canfield, although the communications have included (directly or indirectly) other TEOCO employees such as Ms. Marie Niziolek.  Vogel Decl., ¶¶ 4, 7.  Finally, Mr. Canfield has provided three declarations in the lawsuit, which counsel worked with him to draft and finalize.  *Id.* at 6.

At all times, TEOCO and its employees understood that their communications with Qwest's counsel were deemed confidential to Qwest, and TEOCO and its employees did keep the communications in confidence.  Canfield Decl., ¶ 7; McDonnell Decl., ¶ 7; Vogel Decl., ¶ 9.

## III.    MCLEOD'S SUBPOENAS TO TEOCO AND TWO WITNESSES

On November 7, 2007, McLeod provided three subpoenas to TEOCO's registered agent.  One was a Subpoena *Duces Tecum* directed to TEOCO itself, seeking corporate testimony on 10 enumerated topics and also seeking documents in three categories.  McLeod's Motion to Compel ("McL. Mot."), Ex. A, Sch. A.  Two other subpoenas were solely for individual testimony, one from Mr. Canfield and another from Ms. Niziolek.

TEOCO overlooked the obvious sophomoric service of the personal subpoenas. McLeod did not serve the subpoenas on Mr. Canfield or Ms. Niziolek, which is a blatant violation of the federal rules.  Nonetheless, in the spirit of cooperation, TEOCO did not raise the issue with McLeod's counsel.  McLeod's counsel would merely have requested TEOCO's counsel to accept service (retroactively or for a new subpoena), and with the close of discovery approaching, no purpose would be served in that extra work.

McLeod's counsel provided a copy of the subpoenas to Qwest's counsel. Vogel Decl., ¶ 11. Qwest's counsel then discussed with TEOCO's counsel who would represent TEOCO for the purposes of responding to the subpoena and representing witnesses at their depositions. Vogel Decl., ¶ 13. TEOCO's in-house counsel told Qwest's counsel that it was standard practice for Qwest's outside counsel to represent TEOCO in Qwest's litigation, so at that point Qwest's counsel began their formal representation of TEOCO itself. *Id*.; McDonnell Decl., ¶ 5-6.

## IV.    THE DEPOSITIONS AND QWEST'S ASSERTIONS OF THE ATTORNEY-CLIENT AND WORK-PRODUCT PRIVILEGE

McLeod deposed three TEOCO personnel. Mr. Canfield was deposed on December 11, 2007, both in his personal capacity and as a Rule 30(b)(6) corporate representative on nine of the ten deposition topics in the subpoena on TEOCO. On December 19, 2007, McLeod deposed Mr. John Devolites, TEOCO's Vice President, solely as a Rule 30(b)(6) representative on the one other deposition topic. Later that day, McLeod deposed Ms. Niziolek in her personal capacity.

Prior to the depositions, Qwest's (and also TEOCO's) counsel informed McLeod in writing about Qwest's assertion of attorney-client privilege and work product privilege over communications between Qwest's counsel and TEOCO employees. Vogel Decl., ¶ 17. The issue was also discussed orally between counsel prior to the deposition. *Id*. at ¶ 20.

Qwest's invocation of these privileges was no surprise to McLeod's counsel. In a completely separate lawsuit in Colorado, Qwest is litigating with another phone carrier, Hypercube, LLC, about the same kind of billing disputes between McLeod and Qwest. *Id*. at ¶¶ 14-15. Coincidentally, Hypercube is represented by the ***same law firm*** as McLeod – Bingham

McCutcheon – out of the same Washington, D.C. office.  In the Hypercube case, Bingham McCutcheon has tried this very same attack, attempting to obtain discovery on TEOCO's communications (and specifically Mr. Canfield's communications) with Qwest counsel in the course of the Hypercube case.  Hypercube filed a motion to compel, and Qwest filed an opposition raising the attorney-client and work-product privileges.  Vogel Decl., ¶¶ 14-16.  The opposition was filed the day before Mr. Canfield's deposition, so at the start of Mr. Canfield's deposition, Mr. Vogel inquired if McLeod's counsel had seen the opposition Qwest intended to raise the same arguments in the McLeod litigation.  Vogel Decl., ¶ 20.  McLeod's counsel had not seen the Hypercube document, so after the deposition Qwest's counsel arranged for McLeod's counsel to obtain it.  Vogel Decl., ¶ 18.  (Hypercube withdrew its motion to compel without even filing a reply brief.)

At Mr. Canfield's deposition, McLeod's counsel asked a very small number of questions that drew the privilege objections previously communicated to McLeod.  McLeod asked about Mr. Canfield's (and other TEOCO employees') communications with Qwest's counsel regarding Mr. Canfield's analysis of data at counsel's request, to which Qwest's and TEOCO's counsel Mr. Vogel objected.  McL. Mot. at 5.  McLeod's counsel knew the objection was forthcoming, based on the parties' exchanges prior to the deposition, so he moved on to other topics.

By contrast, McLeod obtained significant testimony over several hours from Mr. Canfield concerning Mr. Canfield's actual analysis of the data.  Vogel Decl., ¶¶ 21-22.  Qwest also produced the data and Mr. Canfield's spreadsheets analyzing it, and McLeod counsel reviewed that material in great detail at the deposition.  Therefore, McLeod obtained full

discovery on Mr. Canfield's actual data analysis; McLeod merely did not obtain discovery on

Mr. Canfield's communications with Qwest's counsel.

## V.    MCLEOD'S MOTION TO COMPEL

Unlike their colleagues who withdrew the baseless motion to compel in the

Hypercube case, McLeod has filed this motion to compel to obtain testimony about

communications (oral and written) between TEOCO and Qwest's outside counsel.  McLeod's

motion states that, "TEOCO should be compelled to produce, and testify about, its

communications with Qwest's outside counsel."  McL. Mot. at 7.

McLeod's motion also seeks to compel TEOCO to respond to two specific topics

set forth in TEOCO's Rule 30(b)(6) subpoena.  Topic 6 sought testimony on "[TEOCO's]

discussion with counsel in connection with any disputes at issue in the Litigation."  Topic 7

sought "testimony on TEOCO's targets, goals, and hypotheses for conducting ay of the damage

analyses or calculations that it performed for Qwest."  McL. Mot. at 4 & Ex. A, Schedule A.

McLeod is specifically demanding that TEOCO divulge Qwest and Qwest's

counsel's views of Qwest's potential damages.  *Id*. at 4.

<u>**ARGUMENT**</u>

McLeod's motion is clearly forbidden by well-established law about the attorney-

client privilege held by corporations such as Qwest and also blatantly seeks attorney work

product.  The Court should deny McLeod's motion.

## I.    QWEST ENJOYS THE PROTECTION OF THE ATTORNEY-CLIENT PRIVILEGE IN COMMUNICATIONS BETWEEN QWEST'S COUNSEL AND TEOCO'S EMPLOYEES, WHO ARE "FUNCTIONAL" QWEST EMPLOYEES

The law is well-settled that companies such as Qwest enjoy the attorney-client

privilege over communications between their litigation counsel and company employees, even

though counsel, obviously, does not "represent" the employees.  That same privilege extends to communications between counsel and a support vendor's employees, where the support vendor – such as TEOCO here – provides ongoing litigation services to Qwest's business.  Thus, TEOCO's employees are "functionally" the equivalent of Qwest employees.  McLeod ignores this bright-line rule and instead focuses on whether an attorney-client relationship exists between counsel and TEOCO itself, which is irrelevant.  Qwest has a privilege and Qwest is asserting it here.

> **A.**    **The Attorney-Client Privilege Extends To Corporations Like Qwest**

It is black-letter law – which, not surprisingly, McLeod repeatedly recognized throughout discovery – that the attorney-client privilege extends to corporations, and thus McLeod cannot obtain discovery on communications between its litigation counsel and Qwest's employees.

Common law and the controlling Federal Rules of Civil Procedure firmly establish that in the vast majority of situations, information subject to the attorney-client privilege is not discoverable.  *Upjohn Co. v. United States*, 449 U.S. 383, 390-91, (1981); *In re Sealed Case*, 676 F.2d 793, 808, 812 n.72 (D.C. Cir. 1982).  Matters covered by the attorney-client privilege (and the attorney-work-product doctrine) are exceptions to the general policy favoring liberal discovery.  *Tax Analysts v. I.R.S.*, 294 F.3d 71, 76 (D.C. Cir. 2002).  The policy of protecting confidential communications between the attorney and client facilitates the full development of facts essential to proper representation of the client.  *Upjohn*, 449 U.S. at 389; *Martin v. Lauer*, 686 F.2d 24, 32 (D.C. Cir. 1982).  Courts have also recognized that the attorney-client privilege exists to protect not only the giving of professional advice to those who

can act on it, but also the giving of information to the lawyer to enable him to give sound and informed advice. *Tax Analysts v. I.R.S.*, 117 F.3d 607, 618 (D.C. Cir. 1997).

The attorney-client privilege fully extends to corporations. *Upjohn*, 449 U.S. at 390. This Circuit, adopting the reasoning of the Supreme Court in *Upjohn*, has applied an expansive interpretation of the attorney-client privilege to protect communications between a corporation's employees and the corporation's counsel. *See Fed. Trade Comm'n v. GlaxoSmithKline*, 294 F.3d 141, 148 (D.C. Cir. 2002); *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1302 (D.C. Cir. 1988). In so holding, courts have stressed the importance of applying the privilege in the corporate context to protect the ability of attorneys to garner the information necessary to providing sound legal advice. *See Liberty Lobby, Inc.*, 838 F.2d at 1302 ("In *Upjohn* . . . , the Supreme Court held that communications between corporate counsel and a corporation's employees made for the purpose of rendering legal advice are protected by the attorney-client privilege. Such discussions are shielded from discovery in order to assure 'full and frank legal advice to the employees who will put into effect the client corporation's policy.'" (quoting *Upjohn*, 449 U.S. at 392)).

**B.    Qwest's Privilege Extends To Communications Between Counsel And Employees Of Qwest's Support Vendors**

This and many other courts examining the issue agree that corporate privileges such as Qwest's extends to communications of a legal nature between Qwest's counsel and the employees of Qwest's support vendors such as TEOCO.

This Circuit held that the corporate privilege extends to communications between counsel and an independent contractor, in certain circumstances. *GlaxoSmithKline*, 294 F.3d at 148. This opinion examined a series of factors that, without citing them, are derived from the

seminal case *In re Bieter Co.*, 16 F.3d 929 (8th Cir. 1994). McLeod recognizes that the *Bieter*

test is fully applicable and proper; McLeod's brief states McLeod "does not challenge" the

reasoning and holding of *Bieter*. McL. Mot. at 7.

The logic of *GlaxoSmithKline* and *Bieter* is unassailable. As the Eighth Circuit

stated, "[A]t times there will be potential information-givers who are not employees of the

corporation but who are nonetheless meaningfully associated with the corporation in a way that

makes it appropriate to consider them insiders for purpose of the [attorney-client] privilege."

*Bieter*, 16 F.3d at 936 (citations and internal quotations omitted). The attorney-client privilege

should extend to relationships where the information-giver is "an employee, agent, or

independent contractor with a significant relationship to the corporation and the corporation's

involvement in the transaction that is the subject of legal services." *Id.* at 937 (citation and

internal quotations omitted) . *Bieter* recognized that failing to extend the privilege to

independent contractors would limit a lawyer's ability to gather necessary facts for sound

representation. *Id.* Thus, "when applying the attorney-client privilege to a corporation or

partnership, it is inappropriate to distinguish between those on the client's payroll and those who

are instead, and for whatever reason, employed as independent contractors." *Id.* Both

employees and independent contractors may have extremely sensitive and important information

that must be communicated to the lawyer for the lawyer to provide effective representation. As

another court summarized:

> The Court finds persuasive the reasoning of the *Bieter* court. . . . In
> applying the principles set forth by the Supreme Court in *Upjohn*,
> there is no reason to distinguish between a person on the
> corporation's payroll and a consultant hired by the corporation if
> each acts for the corporation and possesses the information needed
> by attorneys in rendering legal advice.

*In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213, 218-19 (S.D.N.Y. 2001).

### C.    All Of The Requirements Are Present For Qwest's Privilege To Extend To Communications Between Qwest's Counsel And TEOCO

*GlaxoSmithKline* relied on four factors – all derived from *Bieter* – to conclude that corporate counsel's communications with a support vendor's employees were within the scope of the corporation's privilege.  These factors, applied here, are that:

(1)    The communications were made between Qwest's counsel and TEOCO employees,

(2)    who were acting within the scope of their responsibility,

(3)    at the direction of Qwest or its counsel, and

(4)    concerning legal issues for the overall purpose of providing the corporation with legal advice.

*GlaxoSmithKline*, 294 F.3d at 148; *accord Bieter*, 16 F.3d at 398-99.

All of these conditions are present here.  The Court should conclude McLeod is not entitled to any of the further discovery its motion to compel seeks because the communications are shielded by Qwest's attorney-client privilege.

### 1.    *The communications were between Qwest's counsel and TEOCO employees.*

The first factor examined in *GlaxoSmithKline* is clearly met here.  No question exists that the communications at issue were between Qwest's outside counsel representing Qwest in the lawsuit against McLeod and TEOCO employees such as Mr. Canfield.

### 2.    *The TEOCO employees were acting within the scope of their responsibility.*

The second *GlaxoSmithKline* factor is easily met too.  Since July 2006, Mr. Canfield has held the primary responsibility for reviewing and processing McLeod's monthly

access charge invoices on Qwest's behalf.  Canfield Decl., ¶¶ 3-6.  TEOCO and Mr. Canfield

have a significant relationship to the transaction that forms the basis of the current dispute:

McLeod's access charges to Qwest.  Since July 2006 Mr. Canfield has been responsible for

processing and auditing McLeod's invoices.  *Id.*  In this role, Mr. Canfield, or employees who

work for Mr. Canfield, review and analyze McLeod's access charges each month and identify

which access charges Qwest is disputing.  *Id.*  As such, when Qwest and Cooley sought to

calculate damages in this litigation based on McLeod's access charges and invoices, it turned to

TEOCO and primarily to Mr. Canfield.  Vogel Decl., ¶¶ 4-7.

### 3.    *Qwest's counsel directed these communications.*

The third *GlaxoSmithKline* factor is present.  The very nature of the

communications and documents at issue in this Motion to Compel indicate that TEOCO

communicated with Qwest's counsel at the direction of Qwest or its counsel.

McLeod's subpoena topic 6 seeks testimony on "[TEOCO's] discussion with

counsel in connection with any disputes at issue in the Litigation."  Thus, any communication

falling within this subpoena topic was, by definition, intended to obtain legal advice as to the

issues in dispute in this litigation.  Canfield Decl., ¶ 7; Vogel Decl., ¶ 9.

Similarly, McLeod's subpoena topic 7 seeks "testimony on TEOCO's targets,

goals, and hypotheses for conducting any of the damage analyses or calculations that it

***performed for Qwest.***"  McL. Mot. at 4 (emphasis added).  As McLeod's own subpoena

demands indicate,  TEOCO communicated with and performed analyses for Qwest at Qwest's

request (or at the request of its counsel) to investigate contested issues and damages at issue in

this litigation.  Canfield Decl., ¶ 7; Vogel Decl., ¶¶ 4-7.

4.      *The purpose of the communications were to secure legal advice for Qwest in its litigation with McLeod.*

Finally, the fourth *GlaxoSmithKline* factor is satisfied. Qwest's outside counsel, Cooley Godward Kronish LLP ("Cooley"), communicated with TEOCO employees on numerous occasions after the commencement of litigation regarding the subject matter of this lawsuit. Canfield Decl., ¶ 7; McDonnell Decl., ¶¶ 5-6; Vogel Decl., ¶¶ 4-7. Indeed, Mr. Canfield did not even start working for TEOCO on McLeod-related issues (July 2006) until *after* the lawsuit was filed (March 2006). Mr. Canfield was also involved in numerous conversations with Qwest employees when Qwest's counsel was present for the purpose of educating Qwest and Qwest's counsel about the current dispute. Canfield Decl., ¶ 7; Vogel Decl., ¶ 8. Mr. Canfield has been, and is, Qwest's counsel's primary point of contact on many of the issues involved in this litigation, including the amount and legitimacy of McLeod's access charges. Vogel Decl., ¶ 4. Mr. Canfield has consistently educated Qwest's counsel on issues surrounding the parties' dispute and has provided Qwest's counsel with factual information necessary to provide satisfactory legal advice. *Id.* at ¶¶ 4-8.

5.      *The communications have remained confidential.*

As with any assertion of the attorney-client privilege, the requirement that the communications remain confidential is satisfied. (*GlaxoSmithKline* did not state this as a separate part of the test; *Bieter* did, *see* 16 F.3d at 399.) Since the inception of this litigation, Qwest's counsel has treated TEOCO employees, including Mr. Canfield, as agents of Qwest for purposes of communicating the facts necessary for Cooley to provide effective legal assistance to Qwest. Canfield Decl., ¶ 7; Vogel Decl., ¶ 9. Cooley instructed Mr. Canfield that communications with Cooley and Qwest's in-house counsel were subject to Qwest's privileges,

and Cooley treated these communications as confidential.  Similarly, Mr. Canfield intended that

his conversations with Qwest's attorneys be kept confidential.  Canfield Decl., ¶ 7.

   The *GlaxoSmithKline* and *Bieter* factors are not addressed by McLeod, even

though McLeod knew Qwest would raise them here (because Qwest raised them in the

Hypercube matter in Colorado).  McLeod's silence demonstrates it knows it has no retort to the

conclusion that the privilege fully applies here.

   **D. McLeod's Arguments Incorrectly Analyze**
     **TEOCO's Privilege, Not Qwest's Privilege**

   McLeod basically raises one argument, and it is completely misguided.  McLeod

argues that TEOCO was not a client of Qwest's counsel at the time these communications took

place.  McL. Mot. at 6.

   Nowhere is that a factor in *GlaxoSmithKline* or *Bieter*, and McLeod does not cite

a single case for the proposition that it is a relevant factor.  Corporate counsel are not deemed to

represent company employees – they represent the corporation – but of course counsel's

communications with employees are privileged, so those attorneys could collect the frank and

full information necessary to represent the corporation properly. *See Upjohn*, 449 U.S. at 392-93.

If McLeod's argument were true, then any corporate counsel would also have to establish

attorney-client relationships with every company employee that is interviewed as a part of

counsel's representation of the company.  *Cf. United States v. International Bhd. of Teamsters,*

*Chauffeurs, Warehousemen  and Helpers of Am.*, 119 F.3d 210, 215 (2d Cir. 1997) ("courts have

held that any privilege that attaches to communications on corporate matters between corporate

employees and corporate counsel belongs to the corporation, not to the individual employee. . ."

and collecting cases).  That is patently absurd, and simply stating the proposition shows it to be

frivolous.  *GlaxoSmithKline* and *Bieter* merely extend this well-entrenched privilege to certain support vendors who are the "functional equivalent" of corporate employees.  *GlaxoSmithKline*, 294 F.3d at 148; *Bieter*, 16 F.3d at 939.  If counsel do not need to formally represent company employees for the privilege to apply, then no reason exists they must formally represent the "functional equivalent" of those employees of support vendors.

Trying to twist every fact into something relevant, McLeod appears to be asserting some kind of estoppel argument.  McLeod claims Qwest's counsel did not know if counsel was authorized to accept service of a subpoena on TEOCO, and from this McLeod contends Qwest cannot now assert a privilege in communications with TEOCO.  McL. Mot. at 7.  Again, this is argued without any authority and fundamentally misconstrues the nature of the privilege at issue.  Qwest's counsel need not be the formal lawyer ***for TEOCO*** for Qwest's privilege to apply.  TEOCO is still a separate company entitled to all of the protections of the Federal Rules of Civil Procedure, including service of subpoenas.  *See In re Copper Market*, 200 F.R.D. at 216-17 (subpoena served on independent consultant quashed where consultant found to be equivalent to corporation employee and communication from consultant held protected by corporation's attorney-client protection).  McLeod is basically trying to take the *GlaxoSmithKline* and *Bieter* tests and run to the other extreme; Qwest's counsel is not authorized to accept service of a subpoena on non-party TEOCO or its employees merely because counsel spoke with those employees as part of the litigation.

McLeod's arguments lack an understanding of controlling law and are made without citation to any case that addresses the situation here.  This Court should apply *GlaxoSmithKline* and deny McLeod's motion.

## II.    THE WORK-PRODUCT DOCTRINE BARS MCLEOD'S DISCOVERY OF COUNSEL'S COMMUNICATIONS WITH TEOCO EMPLOYEES

McLeod has totally ignored the other fundamental problem with its motion.  As Qwest informed McLeod, Qwest is also asserting its work-product privilege with respect to counsel's communications with TEOCO employees.  Vogel Decl., ¶ 17.  Yet knowing this, McLeod did not address it.  This privilege moots McLeod's motion, because even if no attorney-client privilege were present, the work product privilege independently bars McLeod's requested discovery.

Federal Rule of Civil Procedure 26(b)(3) governs the disclosure of attorney-work product and bars disclosure of "documents and tangible things otherwise discoverable . . . prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."  This policy against disclosure is to "be interpreted broadly and held largely inviolate."  *Judicial Watch, Inc. v. Department of Justice*, 432 F.3d 366, 369 (D.C. Cir. 2005).  Disclosure of such work product is available only upon a showing of both "substantial need" and "undue hardship."  Fed. R. Civ. P. 26(b)(3).

Material qualifies as work product if it is "'obtained or prepared by an adversary's counsel' in the course of his legal duties, provided that the work was done 'with an eye toward litigation.'"  *In re Sealed Case*, 676 F.2d at 809 (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)).  Although Rule 26(b)(3) explicitly provides protection only for "documents and tangible things," courts have recognized that the protection also extends to opinions and other intangible work product under the Supreme Court's decision in *Hickman*, 329 U.S. at 510-11.  *See, e.g., In re Sealed Case*, 676 F.2d at 809-10.

McLeod has requested discovery of Qwest's counsel's strategies in the case and of Qwest's upcoming plans for the trial. McL. Mot. at 4. Even if that information was revealed to TEOCO employees, it lies are the core of protected work product. *See United States v. American Tel. & Tel. Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980) (under "common interest rule," parties with shared interests in actual or potential litigation against common adversary may share privileged information without waiver); *In re Copper Mkt.*, 200 F.R.D. at 221 n.6 (disclosure of work product to party sharing common interests does not waive protection, corporation and its consultant in litigation "clearly shared a common interest"). Disclosure of this sort of work product, moreover, would reveal "the opinions, judgments, and thought processes of counsel," and would require McLeod's showing of "extraordinary justification" above and beyond even the showing required for disclosure of work product containing mere facts and data. *In re Sealed Case*, 676 F.2d at 809-10.

Furthermore, Qwest's counsel's communications with TEOCO about what data to analyze and why is equally entitled to the work-product protection. Qwest's counsel communicated with and collected data from TEOCO and its employees during the course of litigation and for the purpose of preparing for eventual trial. Canfield Decl., ¶¶ 5-7. McLeod would have to make a showing of substantial need or undue hardship that would justify disclosure of Qwest's communications with TEOCO about this data-collection effort. McLeod has not attempted to do so, nor could it. McLeod examined all of TEOCO's witnesses at length about the data they analyzed and their conclusions. None of this revealed work product; the testimony was about what the witnesses did themselves, how they analyzed data, and what the data showed. Thus, McLeod has had full and unfettered access to the analysis of the data. There is no need for McLeod to know why Qwest counsel sought the analysis, or what Qwest counsel

plans to do with it.  There is a clear line between obtaining Qwest's counsel's strategies and discovering admissible evidence, such as summaries of millions of calls or large invoices. McLeod has no undue hardship here.  *See Director, Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1308 (D.C. Cir. 1997) ("Undue hardship asks whether the moving party can acquire the information any other way; by definition, a party seeking corroborative evidence has already found a way to get the same information.").

## CONCLUSION

For these reasons, the Court should deny McLeod's motion.

Dated:  January 18, 2008                    Respectfully submitted,

/s/ Douglas P. Lobel
Douglas P. Lobel (DC Bar No. 395508)
David A. Vogel (DC Bar No. 441289)
COOLEY GODWARD KRONISH LLP
One Freedom Square ♦ Reston Town Center
11951 Freedom Drive
Reston, Virginia 20190-5656
Telephone:  (703) 456-8000
Facsimile:  (703) 456-8100
Email:  dlobel@cooley.com
          dvogel@cooley.com

*Attorneys for TEOCO Corporation,*
*Qwest Corporation, and*
*Qwest Communications Corporation*

350498 v1/RE                                      19

## CERTIFICATE OF SERVICE

I, Douglas P. Lobel, hereby certify that on the 18th day of January, 2008,

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO

MCLEOD'S MOTION TO COMPEL AND TO ENFORCE SUBPOENA was filed through the

ECF system and will be sent electronically, via the ECF system, to the following registered

participants, as also identified on the Notice of Electronic Filing (NEF). There are no non-

registered participants in this case to my knowledge and belief.

Robin F. Cohn
Warren Anthony Fitch
Jason R. Scherr
BINGHAM MCCUTCHEN, LLP
2020 K Street, NW
Washington, DC 20006
robin.cohn@bingham.com
tony.fitch@bingham.com
jr.scherr@bingham.com

Jeana L. Goosmann
John C. Gray
HEIDMAN REDMOND FREDREGILL
PATTERSON PLAZA DYKSTRA & PRAHL
1128 Historic 4th Street
PO Box 3086
Sioux City, IA 51102
jeana.goosmann@heidmanlaw.com
john.gray@heidmanlaw.com

Jonathan S. Frankel
Richard M. Rindler
BINGHAM MCCUTCHEN LLP
3000 K Street NW
Suite 300
Washington, DC 2007-5116
jon.frankel@bingham.com
r.rindler@bingham.com

/s/ Douglas P. Lobel
Douglas P. Lobel

'

# EXHIBIT 1

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MCLEODUSA TELECOMMUNICATIONS SERVICES, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>QWEST CORPORATION and QWEST COMMUNICATIONS CORPORATION,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Misc. Action No. 1:08-mc-00011-EGS

**Related to:**
**Civil Action No.: 06-CV-35**
**United States District Court**
**For the Northern District of Iowa**
**(Cedar Rapids Division)**

## DECLARATION OF MICHAEL MCDONNELL IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF MCLEODUSA'S MOTION TO COMPEL AND TO ENFORCE SUBPOENA

I, MICHAEL MCDONNELL, hereby declare:

1.     I am the General Counsel for TEOCO Corporation ("TEOCO") and have held this position since August 2003.

2.     TEOCO has no contacts with the District of Columbia. TEOCO's headquarters is in Reston, Virginia, where I am employed. TEOCO has employees in other states as well. However, TEOCO has no offices, property or employees in the District of Columbia. In addition, TEOCO has no customers based in the District of Columbia, and TEOCO has no service vendors based in the District of Columbia. TEOCO does not pay any taxes to the District of Columbia, and TEOCO does not have any licenses or registrations in the District of Columbia.

3.     TEOCO is an independent contractor for telecommunications corporations including Qwest Communications Corporation ("QCC"). TEOCO has a contract with QCC to

provide, among other services, the review and processing of invoices to QCC from Competitive

Local Exchange Carriers ("CLECs"). TEOCO has contracted with QCC to provide these

services or similar services for at least the previous four (4) years.

4.    One service TEOCO provides for QCC is the identification of potential

billing errors or inaccuracies in CLECs' switched access bills to QCC. Sometimes these billing

issues will rise to the level of litigation. One of TEOCO's standards services to Qwest is to

provide assistance to Qwest in Qwest's litigation over billing disputes that TEOCO analyzed.

When QCC is involved in litigation with a CLEC regarding switched access services, the

TEOCO employee assigned to that account regularly will assist QCC with the factual

investigation of QCC's claims and defenses.

5.    Since at least early 2005, QCC has been involved in a series of disputes

with various CLECs regarding access charges for wireless originated toll-free calls (the

"Wireless Access Charge disputes"). TEOCO employees have assisted QCC with the Wireless

Access Charge disputes since that time. It is my understanding that TEOCO employees who

assist QCC in these disputes have provided assistance to QCC's in-house and outside counsel,

have prepared materials in anticipation of litigation or the trial of these matters, have been

deposed as QCC's fact witnesses, and have testified in hearings on QCC's behalf.

6.    It is my understanding and position as General Counsel that TEOCO is

QCC's representative for purposes of assisting QCC with the Wireless Access Charge disputes.

This understanding was formally memorialized in a letter in 2005 between Qwest and TEOCO

related to a Wireless Access Charge dispute between Qwest and another CLEC, and that practice

and understanding has been maintained by both parties with respect to Qwest's other Wireless

Access Charge disputes with other CLECs, including McLeod. As part of this written agreement

and course of conduct, Qwest has been paying all attorney fees for any time Qwest's attorneys work with or represent TEOCO employees, such as defending depositions.

6.    I have confirmed this understanding with QCC's outside counsel in its various litigation, including Lauren Schmidt of the Brownstein law firm in Denver and David Vogel of the Cooley lawfirm.

7.    It is my understanding that Mr. Canfield and Ms. Niziolek have assisted QCC's in-house and outside counsel with the preparation of this litigation. TEOCO has always understood that communications between Qwest's counsel and TEOCO employees is to be treated as highly confidential to Qwest.

8.    My understanding regarding TEOCO's assistance with QCC's Wireless Access Charge disputes, including the current dispute between QCC and McLeod, has not changed.

9.    For the purposes of their depositions, TEOCO and its employees (Messrs. Canfield and John Devolites, and Ms. Marie Niziolek) are represented by QCC's outside counsel, Douglas Lobel and David Vogel of Cooley Godward Kronish LLP. TEOCO asserts its privilege with respect to any communications between counsel and TEOCO witnesses concerning the witnesses' responses to McLeod's subpoenas.

Under the penalty of perjury of the laws of the United States, I declare that the foregoing is true and correct. Executed on January 16, 2008 in Fairfax County, Virginia.

Michael McDonnell, Esq.

350391 v1/RE
01/16/08 10:22 AM

# EXHIBIT 2

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MCLEODUSA TELECOMMUNICATIONS SERVICES, INC., | ) ) ) | |
| Plaintiff, | ) ) | Misc. Action No. 1:08-mc-00011-EGS |
| v. | ) ) ) | |
| QWEST CORPORATION and QWEST COMMUNICATIONS CORPORATION, | ) ) ) ) | <u>Related to:</u><br>**Civil Action No.: 06-CV-35**<br>**United States District Court**<br>**For the Northern District of Iowa** |
| Defendants. | ) ) ) | **(Cedar Rapids Division)** |

<u>DECLARATION OF DEREK CANFIELD IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFF MCLEODUSA'S MOTION TO COMPEL
AND TO ENFORCE SUBPOENA</u>

I, Derek Canfield, hereby declare:

1.      I am the Senior Team Lead within Audit Services for TEOCO Corporation ("TEOCO").

2.      TEOCO is a billing vendor for Qwest Communications Corporation ("QCC"). TEOCO is responsible for, among other things, the review and processing of invoices from Competitive Local Exchange Carriers ("CLECs") to QCC for Switched Access. Specifically, I lead a group of cost auditors who are responsible for validating the accuracy of Switched Access charges billed to our clients. Switched Access charges are usage-sensitive charges assessed by one carrier to another carrier for the purposes of completing a call.

3.      From June 2006 through the present, I have been primarily responsible for auditing the monthly invoices of McLeodUSA Telecommunications Services, Inc. ("McLeod") to QCC.

4.      I was involved in QCC's dispute with McLeod on a supervisory level prior to June 2006. McLeod bills QCC for interstate and intrastate access charges for wireless-originated toll free ("8XX") calls.

5.      Since June 2006, when I assumed primary responsibility for auditing McLeod's monthly invoices to QCC, I have been involved with QCC's factual investigation of its counterclaims and defenses in this lawsuit. QCC, with TEOCO's assistance, was already disputing McLeod's access charges when I started auditing McLeod's invoices in June 2006. McLeod filed its complaint against QCC in March 2006, and QCC filed its initial counterclaims against McLeod in May 2006. I have assisted QCC with the investigation of its counterclaims and defenses since this time period.

6.      Under TEOCO's contract with QCC, my duties included reviewing, auditing, and analyzing McLeod's monthly access charge bills to QCC. TEOCO is responsible for the analyzing these invoices to make an initial determination about which charges McLeod is validly billing and which charges QCC should dispute. I am also responsible for collecting and analyzing McLeod's billing data as it relates to this lawsuit, including but not limited to, issues such as the volume of minutes billed; the rate charges; and the jurisdiction billed (i.e., whether a call is interstate or intrastate). I also supervise other TEOCO employees who assist me with these duties.

7.      From July 2006 through the present, I have communicated with QCC's in-house attorney, Steve Young, and QCC's outside attorneys, Douglas Lobel and David Vogel, on numerous occasions regarding the subject matter of this litigation. At the request of QCC's attorneys, I have also prepared multiple materials in anticipation of litigation and trial in this case. Since July 2006, it has been my understanding that my communications with QCC's

attorneys were made for the purpose of providing assistance to QCC and QCC's attorneys in this case. It has also been my understanding that these communications were confidential and I have treated them as confidential.

     Under the penalty of perjury of the laws of the United States, I declare that the foregoing is true and correct. Executed on January 17, 2008 in Lenexa, Kansas.

Derek Canfield

350378 v1/RE
01/17/08 5:47 PM

# EXHIBIT 3

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MCLEODUSA TELECOMMUNICATIONS SERVICES, INC., | ) ) ) | |
| Plaintiff, | ) ) | Misc. Action No. 1:08-mc-00011-EGS |
| v. | ) ) ) | |
| QWEST CORPORATION and QWEST COMMUNICATIONS CORPORATION, | ) ) ) ) | <u>Related to:</u> **Civil Action No.: 1:06-cv-00035-MWB** **United States District Court** **For the Northern District of Iowa** **(Cedar Rapids Division)** |
| Defendants. | ) ) ) | |

## DECLARATION OF DAVID VOGEL IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF MCLEODUSA'S MOTION TO COMPEL AND TO ENFORCE SUBPOENA

I, David Vogel, hereby declare:

1.      I am a Special Counsel at the law firm of Cooley Godward Kronish LLP

("Cooley").  I am a member in good standing of the bars of the District of Columbia and

Virginia.

2.      My colleague Douglas P. Lobel, a Partner at Cooley, and myself have

served as lead counsel for Qwest Corporation and Qwest Communications Corporation

(collectively, "Qwest") in the lawsuit captioned *McLeodUSA Telecommunications Services, Inc.*

*v. Qwest Corporation and Qwest Communications Corporation*, Case No. 06-CV-35 (N.D. Iowa

filed March 13, 2006) (the "Litigation").  I personally have maintained day-to-day supervisory

responsibilities of the Litigation since its inception.

3.      Plaintiff McLeodUSA Telecommunications Services, Inc. ("McLeod")

commenced the Litigation with the filing of its complaint in March 2006.  Qwest filed its initial

counterclaims against McLeod in May 2006. The parties are litigating about a dozen separate claims and cross-claims, arising out of their exchange of telecommunications services.

4.      After the commencement of this Litigation, my colleagues and myself have communicated extensively with TEOCO Corporation ("TEOCO") employees for the purposes of investigating the facts, preparing strategies and advice to Qwest, conducting discovery, and obtaining testimony for motions. Our primary contact at TEOCO has been Derek Canfield.

5.      On several occasions since July 2006, I have asked TEOCO and Mr. Canfield to analyze massive amounts of electronic information that McLeod produced to Qwest in discovery. This information includes millions of electronic records of individual phone calls, for which McLeod seeks to collect charges from Qwest, as well as summaries of data in McLeod's massive electronic invoices containing these charges.

6.      I have also obtained Mr. Canfield's declarations on three occasions to support Qwest's briefs to the court, and communicated with Mr. Canfield in each case to draft these declarations.

7.      We also communicated with TEOCO as part of our investigation of the facts of the case. TEOCO employees were instrumental in uncovering the problems with McLeod's bills to Qwest, which is what gave rise to parts of the lawsuit.

8.      All of my communications with TEOCO employees have been to gather the facts and information necessary to represent Qwest properly in the Litigation and to prosecute Qwest's counterclaims. We intended these conversations to educate Qwest and counsel about facts and issues involved in the Litigation.

9.    Since the inception of this Litigation, myself and my colleagues have treated TEOCO and its employees, including Mr. Canfield, as agents of Qwest for purposes of communicating the facts necessary for us to provide effective legal assistance to Qwest.

10.    McLeod's counsel, at the firm Bingham McCutcheon, informed me approximately in September 2007 that they desired to take discovery from TEOCO as part of the Litigation.

11.    On November 7, 2007, McLeod sent me three subpoenas intended for TEOCO and two of its employees, Mr. Canfield and Ms. Marie Niziolek. At the time, I had not had any conversations with TEOCO management or its in-house counsel, Mr. Michael McDonnell, about whether our firm could receive service of the subpoenas for TEOCO. I indicated this to McLeod's counsel.

12.    I was later told by McLeod's counsel that McLeod served all three subpoenas on TEOCO's registered agent. This obviously is ineffective service on Mr. Canfield and Ms. Niziolek. Nonetheless, with the close of discovery (December 21) then rapidly approaching, the decision was made not to challenge the manner of service. The TEOCO witnesses were cooperative and were willing to waive formal service of process.

13.    Subsequent to McLeod's service of the subpoenas, TEOCO authorized my firm to represent TEOCO and its employees for the purposes of responding to McLeod's subpoenas. Mr. Canfield informed me that it has been TEOCO's standard practice for Qwest's outside counsel to also represent TEOCO, when other litigants sought discovery from TEOCO as part of the litigation.

14.    I became aware of litigation between Qwest and another phone carrier, named Hypercube, which is pending in state court in Colorado. I have seen pleadings and briefs

from this matter, and I have had numerous conversations with Qwest's counsel in that lawsuit (who are located in Denver, Colorado). Hypercube is represented by other counsel at Bingham McCutcheon, out of the same office as McLeod's counsel (Washington, D.C.).

15.    In the Hypercube case, Hypercube took Mr. Canfield's deposition and then filed a motion to compel when Qwest and TEOCO asserted attorney-client privilege with respect to Mr. Canfield's conversations with Qwest's counsel in that case. Qwest filed an opposition on December 10, 2007.

16.    In its opposition, Qwest asserted both attorney-client privilege and attorney-work-product privilege concerning the communications with Mr. Canfield.

17.    On December 10, 2007, I wrote an email to McLeod's counsel informing them of the Qwest filing in the Hypercube case, and I explained that Qwest in the McLeod case as well would assert both the attorney-client privilege and the work-product privilege with respect to communications with TEOCO. I am attaching a copy of that email as Exhibit A hereto.

18.    I later determined that Qwest filed the Hypercube brief as "CONFIDENTIAL" under a protective order in the Hypercube case (which is why I am not attaching it here), and as a result Mr. Fitch was not authorized to see it. I obtained Qwest's permission for Mr. Fitch to see that opposition brief for the purposes of understanding Qwest's arguments concerning its assertions over communications with TEOCO. I send that authorization to Mr. Fitch by email on December 12 (attached hereto as Exhibit B).

19.    After Qwest filed the opposition brief, Hypercube withdrew its motion.

20.    On December 11, 2007, I represented Mr. Canfield at his deposition by McLeod. I informed McLeod's counsel, Mr. Tony Fitch, that Qwest filed its opposition in

Hypercube the day before and that Qwest would assert the same arguments here in the McLeod case. Mr. Fitch had not seen the opposition brief at the time.

21.     Mr. Canfield's deposition took approximately 5 hours. Most of the time was spent going through electronic spreadsheets that Mr. Canfield had prepared. These spreadsheets analyzed McLeod's electronic records and bills. I did not raise any privilege objections to McLeod's questions to Mr. Canfield about what information was in the spreadsheets and how he manipulated or studied the data in the spreadsheets.

22.     I did instruct the witness not to answer questions that called for revelation of communications Qwest's counsel had with TEOCO witnesses, concerning any issue. These objections did not interrupt or interfere with McLeod's questions to Mr. Canfield about the contents of the spreadsheets he created.

23.     I also represented two other TEOCO deponents, Mr. John Devolites (a corporate representative on a single topic) and Ms. Marie Niziolek (fact witness) at their depositions on December 19, 2007. Again, I instructed the witness not to answer any questions that called for revelation of communications Qwest's counsel had with TEOCO witnesses, concerning any issue. I allowed the witnesses to answer any questions concerning any data analysis or fact investigation they did as part of their job.

Under the penalty of perjury of the laws of the United States, I declare that the foregoing is true and correct. Executed on January 18, 2008 in Reston, Virginia.

David Vogel

# EXHIBIT A

## Vogel, David

| | |
|---|---|
| **From:** | Vogel, David |
| **Sent:** | Monday, December 10, 2007 5:18 PM |
| **To:** | 'tony.fitch@bingham.com' |
| **Cc:** | 'jr.scherr@bingham.com' |
| **Subject:** | Re: TEOCO and Canfield Depositions |

I was in the process of writing a more formal letter, but as I am still meeting with the witness, let me move this ahead.  Mr. Canfield will be the 30b6 on topics 2 through 10, insofar as TEOCO supports Qwest/IXC on billing disputes here.  TEOCO might provide other services to Qwest unrelated to any McLeod issues, so TEOCO won't be doing a 30b6 rep on those.  Also, numbers 6 and 7 are way overbroad, I doubt one witness could possibly provide testimony on the full scope of those subhects.  They seek testimony on every communication at once.  But to the extent a single human can address them, Mr. Canfield is the rep.

As to topic 6, you can ask, but will run into both attorney-client priv as well as work product objections.  Qwest's position on this is being set forth in a brief being filed today in the Hypercube case.  Eighth Circuit law fully supports application of the privilege here, where TEOCO is a support contractor providing litigation support within scope of their general responsibilities.  There is not really much room for debate about it.

As to production, we will have documents at the start of the dep.  I think you have most or all of the electronic spreadsheets.  There are internal emails from early in the CIC 0110 issues, you can have them but they don't shed any light on any of the legal args about the 0110 traffic.

We do plan to start at 9 or as soon as you can get here.  If you come up the Greenway, you will find there is little traffic outside the beltway heading here.  Take the 7100 exit, and follow the Fairfax Parkway to New Dominion, it has much less traffic than on Reston Parkway.

----- Original Message -----
From: Fitch, Warren Anthony <Tony.Fitch@bingham.com>
To: Vogel, David
Cc: Scherr, Jason R. <JR.Scherr@bingham.com>
Sent: Mon Dec 10 16:57:32 2007
Subject: TEOCO and Canfield Depositions

        We propose to start tomorrow morning at 9:00 am or as near to that as traffic allows.

        I have not yet received the production or the 30(b)(6) designations which you said in our Friday telephone conference would be made this afternoon.

WARREN ANTHONY FITCH

Bingham McCutchen LLP

2020 K Street NW

Washington, DC 20006

Tel: (202) 373-6695

Fax: (202) 373-6001

The information in this transmittal (including attachments, if any) is privileged and confidential and is intended only for the recipient(s) listed above.  Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of  the intended recipient.  If you have received this transmittal in error, please notify me immediately by reply e-mail and destroy all copies of the transmittal.  Thank

you.


==============================================================================
Bingham McCutchen LLP Circular 230 Notice: To ensure compliance with IRS requirements, we
inform you that any U.S. federal tax advice contained in this communication is not
intended or written to be used, and cannot be used by any taxpayer, for the purpose of
avoiding any federal tax penalties. Any legal advice expressed in this message is being
delivered to you solely for your use in connection with the matters addressed herein and
may not be relied upon by any other person or entity or used for any other purpose without
our prior written consent.
==============================================================================

# EXHIBIT B

## Vogel, David

| | |
|---|---|
| **From:** | Vogel, David |
| **Sent:** | Wednesday, December 12, 2007 1:22 PM |
| **To:** | 'Fitch, Warren Anthony' |
| **Cc:** | Scherr, Jason R.; Lobel, Douglas; Laing, Hilarie; Bolton, Eric; Samarias, Joseph; 'Schmidt, Lauren E.' |
| **Subject:** | McLeod v. Qwest; TEOCO privilege issues |

Tony:

To follow-up a discussion we had yesterday, my understanding is that the Qwest brief filed Monday in the Hypercube case was deemed "Confidential" because it attached deposition testimony that itself had been "Confidential." I am informed that none of the contents of the brief itself would be deemed "Confidential."

Consequently, you should get a copy of the brief from Ky. You can forward this email to her as authorization from Qwest. I am cc:ing Lauren Schmidt on this email, who represents Qwest in the Hypercube case.

-- David

**David A. Vogel**
Special Counsel
COOLEY GODWARD KRONISH LLP
One Freedom Square ♦ Reston Town Center
11951 Freedom Drive ♦ Reston, VA 20190-5656
Tele: (703) 456-8576 ♦ Fax: (703) 456-8100
dvogel@cooley.com ♦ www.cooley.com/litigation

Assistant: Victoria Taborga
Tele: (703) 456-8690 ♦ vtaborga@cooley.com